# EXHIBIT 8

# U.S. District Court
## California Northern District (San Jose)
## CIVIL DOCKET FOR CASE #: 5:21-cv-06660-SVK

Avrech et al v. T-Mobile USA, Inc.                    Date Filed: 08/27/2021
Assigned to: Magistrate Judge Susan van Keulen        Jury Demand: Plaintiff
Cause: 28:1332 Diversity-(Citizenship)                Nature of Suit: 370 Other Fraud
                                                      Jurisdiction: Diversity

**Plaintiff**

**Aaron Avrech**                       represented by   **Yavar Bathaee**
                                                        Bathaee Dunne LLP
                                                        445 Park Avenue
                                                        9th Floor
                                                        New York, NY 10022
                                                        332-205-7668
                                                        Email: yavar@bathaeedunne.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Brian James Dunne**
                                                        Bathaee Dunne LLP
                                                        633 West Fifth Street
                                                        26th Floor
                                                        Los Angeles, CA 90071
                                                        213-462-2772
                                                        Email: bdunne@bathaeedunne.com
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Heather Avrech**                     represented by   **Yavar Bathaee**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Brian James Dunne**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**T-Mobile USA, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|

| 08/27/2021 | 1 | COMPLAINT against T-Mobile USA, Inc. ( Filing fee $ 402, receipt number 0971-16331759.). Filed byAaron Avrech, Heather Avrech. (Attachments: # 1 Civil Cover Sheet)(Dunne, Brian) (Filed on 8/27/2021) (Entered: 08/27/2021) |
| 08/27/2021 | 2 | Proposed Summons. (Dunne, Brian) (Filed on 8/27/2021) (Entered: 08/27/2021) |
| 08/28/2021 | 3 | NOTICE of Appearance by Yavar Bathaee (Bathaee, Yavar) (Filed on 8/28/2021) (Entered: 08/28/2021) |
| 08/30/2021 | 4 | Case assigned to Magistrate Judge Susan van Keulen. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 9/13/2021. (asS, COURT STAFF) (Filed on 8/30/2021) (Entered: 08/30/2021) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/30/2021 10:17:05 | | | |
| **PACER Login:** | BJVahle132:4638366:4392153 | **Client Code:** | 11360001 |
| **Description:** | Docket Report | **Search Criteria:** | 5:21-cv-06660-SVK |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

1
2
3
4
5
6

**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Edward M. Grauman (*p.h.v. forthcoming*)
egrauman@bathaeedunne.com
Andrew C. Wolinsky (*p.h.v. forthcoming*)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

7
8
9

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
Tel.: (213) 462-2772

10

*Attorneys for Plaintiffs*

11

### UNITED STATES DISTRICT COURT

12

### NORTHERN DISTRICT OF CALIFORNIA

13

### SAN JOSE DIVISION

14

| | |
|---|---|
| AARON AVRECH; HEATHER AVRECH, | Case No. _____. |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| T-MOBILE USA, INC., a Delaware corporation, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

## INTRODUCTION

1. On August 15, 2021, public reports surfaced that a hacker had obtained the personally identifiable information ("PII") of approximately 100 million customers of Defendant T-Mobile USA, Inc. ("T-Mobile"). The PII was obtained through unauthorized access of T-Mobile servers (the "Data Breach") and appears to have affected nearly all of T-Mobile's 102.1 million users in the United States.

2. The hacker put a subset of the data—a collection containing Social Security numbers and driver's license information for thirty million T-Mobile customers—for sale on the dark web for 6 Bitcoin, or approximately $270,000 as of the date of this Complaint. The seller stated that the remainder of the data was being sold privately.

3. The hacker described these 100 million user records to a journalist as "T-Mobile USA. Full customer info," which was obtained through multiple compromised servers related to T-Mobile. The data includes Social Security numbers, phone numbers, names, physical addresses, unique International Mobile Equipment Identity ("IMEI") numbers (a fifteen-digit number unique to each mobile device), and driver's license information.

4. Through its failure to adequately protect Plaintiffs' and class members' data, and in particular after a series of past failures, T-Mobile has exposed nearly its entire user base to irreparable harm through the exposure of their personally identifiable information—leaving these users vulnerable to theft and fraud.

5. This was not T-Mobile's first data breach. Since 2018, T-Mobile has notified its customers of at least *six* other data breaches that imperiled its millions of customers' sensitive information. No matter how many times T-Mobile promises out of court to do better, it just does not do so.

6. This is because T-Mobile has never addressed the root problem. Data centralization and aggregation is dangerous, particularly so when the data need not be kept at all. If T-Mobile had never maintained sensitive customer information in a centralized place—susceptible and vulnerable to a single point of compromise—it would not have repeatedly experienced such sweeping data breaches. However, T-Mobile is too attached to the targeting and profitability edges it gains from continuously deploying powerful machine learning and data mining tools against a giant, aggregated pool of customer data. For

T-Mobile, massively aggregated, easy-to-programmatically-access customer data is a designed feature, not a bug. And this imperils the sensitive information of T-Mobile's millions of customers, including Plaintiffs.

7. This lawsuit seeks an injunction to judicially fix what T-Mobile refuses to cure on its own.

## PARTIES

### I. DEFENDANT

8. Defendant T-Mobile is a Bellevue, Washington-based corporation incorporated under the laws of Delaware.

9. T-Mobile is a telecommunications company that, among other things, provides mobile and wireless services to approximately 102.1 million post-paid and pre-paid customers in the United States. T-Mobile, through its two flagship brands T-Mobile and Metro by T-Mobile, provides service, devices, and accessories through its owned and operated retail stores, online store, and T-Mobile app.

10. T-Mobile has over 75,000 employees, with offices and retail stores around the United States.

11. T-Mobile's headquarters is located at 12920 SE 38th Street, Bellevue, WA, 98006.

### II. PLAINTIFFS

12. Plaintiff Aaron Avrech is a resident of San Jose, California. Mr. Avrech has been a T-Mobile customer for approximately ten years.

13. Plaintiff Heather Avrech is a resident of San Jose, California. Ms. Avrech has been a T-Mobile customer for approximately ten years.

14. On information and belief, Plaintiffs are individuals who had their PII compromised in the Data Breach. Plaintiffs bring this action on behalf of themselves and all those similarly situated across the United States.

15. Plaintiffs place significant value in the security and privacy of their PII, and trusted T-Mobile to protect that information based on the public statements that T-Mobile has made about user privacy.

16.     Plaintiffs believed that T-Mobile would keep their PII secure and employ reasonable and adequate security measures to ensure that their PII would not be compromised. If Plaintiffs had known of T-Mobile's inability to protect user PII and T-Mobile's inadequate security practices, Plaintiffs would not have used T-Mobile's services.

17.     Plaintiffs are concerned about the ongoing threat to their PII absent injunctive relief from this Court. It is clear, based on recent history, that T-Mobile will not adequately protect Plaintiffs' PII on its own—no matter how many out-of-court promises the company makes about data security and privacy.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy in this case exceeds $75,000 and the action is between citizens of different states.

19.     This Court has personal jurisdiction over T-Mobile because the conduct alleged in this Complaint occurred in and/or emanated from the State of California.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because T-Mobile does business in this judicial district and the conduct at issue occurred in and/or emanated from this judicial district.

## FACTS

## I.     T-MOBILE'S SERVICES AND HISTORY OF DATA BREACHES

21.     According to its 2020 annual report, T-Mobile is the "Un-carrier." Through its Un-carrier strategy, T-Mobile purports to have "disrupted the wireless communications services industry, by actively engaging with and listening to our customers and eliminating their existing pain points, including providing them with added value, an exceptional experience and implementing signature Un-carrier initiatives that have changed wireless for good." These Un-carrier initiatives "ended annual service contracts, overages, unpredictable international roaming fees, data buckets and so much more."

22.     However, when it comes to the data collection, T-Mobile's back office collects just as much sensitive data as other American mobile telecommunications companies—including username, address, date of birth, Social Security number, payment card information, driver's license number, and

IMEI numbers. T-Mobile also collects and stores customer proprietary network information ("CPNI")— *i.e.*, data reflecting the time, date, duration, and destination number of each call—for all of its users.

23.     T-Mobile then pools and centralizes its users' sensitive data in unreasonably dangerous ways—making decades worth of sensitive data from unrelated customers and, indeed, former customers—in giant data agglomerations that T-Mobile mines for increased profit.

24.     This mass centralization of years of sensitive data, stored in aggregations made readily accessible to powerful machine-learning and AI tools, creates a dangerous situation in which T-Mobile users' data is unreasonably accessible to hacking and malicious actors through escalated privileges and to attacks that exploit small security holes and then gain access to T-Mobile's mother lode.

25.     Again, this is by design—T-Mobile dangerously and unreasonably centralizes and makes accessible for ML / AI tools and other data analysis tools its customers' (and indeed, former customers') sensitive data, so that T-Mobile can increase its profits by better targeting its actions. As a corollary of this business decision to prioritize profits over data privacy, T-Mobile's customers are dangerously and unreasonably exposed to hacks. This situation continues as of the date of this Complaint.

26.     T-Mobile has had a long history of mismanagement of its users' PII. Since 2018, T-Mobile has notified its millions of customers of at least six other data breaches where malefactors have obtained unauthorized access to T-Mobile customer PII.

27.     First, in August 2018, T-Mobile reported a data breach that exposed the PII of approximately two million T-Mobile customers' names, billing ZIP codes, phone numbers, email addresses, account numbers, and account types.

28.     Then, in November 2019, T-Mobile also alerted its users that hackers accessed PII for about one million T-Mobile prepaid customers, including names, billing addresses, phone numbers, account numbers, rate plans, and plan features.

29.     T-Mobile had three separate breaches in 2020. In March 2020, hackers accessed an undisclosed number of T-Mobile employee emails. According to T-Mobile, some of the compromised accounts "contained account information for T-Mobile customers and employees." T-Mobile also stated

that the hacker may have used this information to steal data on T-Mobile employees and some of its customers.

30.     In December 2020, T-Mobile reported another breach that affected approximately 200,000 customers. That hack exposed customer details including phone numbers, the number of lines subscribed to on an account, and, in some cases CPNI information T-Mobile collected from its customers that is (supposed to be) protected by federal regulations.

31.     A second attack in December 2020 exposed the PII of approximately 47 million current and former T-Mobile customers. This information was obtained off of T-Mobile's servers by hackers and put up for sale on the dark web. According to T-Mobile, the data included first and last names, dates of birth, Social Security numbers, and driver's license numbers.

32.     Lastly, in February 2021, T-Mobile disclosed a data breach after an unknown number of its customers were affected by SIM swap attacks. SIM swap fraud allows scammers to take control of their targets' phone numbers. After the SIM swap has been effectuated, the scammer receives the victims' messages and calls, which allows for easy circumvention of multi-factor authentication systems associated with banking accounts, medical records, and email. Victims can even be locked out of their own accounts after a SIM swap attack. In a notice to its customers, T-Mobile told its customers that an unknown attacker gained access to customer account information, including unspecified "personal information" and user account personal identification numbers.

33.     T-Mobile's discussed at length in its 2020 annual report how its customers' PII is an attractive target for hackers. Because T-Mobile is considered a "critical infrastructure provider," it "may be more likely to be the target of cyber-attacks (*e.g.*, denial of service and other malicious attacks). Such attacks against companies may be perpetrated by a variety of groups or persons, including those in jurisdictions where law enforcement measures to address such attacks are ineffective or unavailable, and such attacks may even be perpetrated by or at the behest of foreign governments."

34.     According to T-Mobile's 2020 annual report, typical prior data breach "incidents involved attempts to commit fraud by taking control of a customer's phone line. In a few cases, incidents involved unauthorized access to credit card information, financial data, Social Security numbers, or passwords."

35.     And T-Mobile accurately predicted in its 2020 annual report that it would be the target of future attacks: "we expect to continue to be the target of cyber-attacks, data breaches, or security incidents, which may in the future have a material adverse effect on our business, reputation, financial condition, and operating results."

## II.     APPROXIMATELY 100 MILLION T-MOBILE CUSTOMER ACCOUNTS ARE COMPROMISED IN AUGUST 2021

36.     On August 15, 2021, Vice Media reported that T-Mobile was investigating a post in an underground online forum claiming that "a mountain of personal data" was being offered for sale on the dark web. Vice Media contacted the hacker who obtained the data, confirmed that the hacker had obtained data related to over 100 million people, and also confirmed that the data came from T-Mobile's servers.

37.     The data obtained by the hacker includes Social Security numbers, phone numbers, names, physical addresses, unique IMEI numbers, and driver's license information, the seller said. Vice Media reviewed samples of the data, and confirmed that the samples contained accurate information on T-Mobile customers.

38.     In an online chat, the hacker told Vice Media that the data was from "T-Mobile USA. Full customer info." The seller told Vice Media that they had compromised multiple servers relating to T-Mobile.

39.     The hacker posted in the underground online forum that a subset of the data containing PII for 30 million T-Mobile customers—including Social Security numbers and driver's license information—was available for 6 Bitcoin, or approximately $270,000 as of the date of this Complaint. The seller stated that they would privately sell the rest of the data.

40.     The hacker also told Vice Media that T-Mobile seemed to be aware of the issue, because the hacker lost access to the servers. Still, the hacker told Vice Media that they already downloaded the data and backed it up in multiple places.

41.     The next day, August 16, T-Mobile issued the following statement:

> We have been working around the clock to investigate claims being made that T-Mobile data may have been illegally accessed. We take the protection of our customers very seriously and we are conducting an

6

extensive analysis alongside digital forensic experts to understand the validity of these claims, and we are coordinating with law enforcement.

We have determined that unauthorized access to some T-Mobile data occurred, however we have not yet determined that there is any personal customer data involved. We are confident that the entry point used to gain access has been closed, and we are continuing our deep technical review of the situation across our systems to identify the nature of any data that was illegally accessed. This investigation will take some time but we are working with the highest degree of urgency. Until we have completed this assessment we cannot confirm the reported number of records affected or the validity of statements made by others.

42. T-Mobile also set up a website on August 19, 2021 providing "Notice of Data Breach" to its customers. T-Mobile stated that "[o]n August 17, 2021, T-Mobile learned that a bad actor illegally accessed personal data. Our investigation is ongoing, but we have verified that a subset of T-Mobile data had been accessed by unauthorized individuals and the data stolen from our systems did include some personal information."

43. According to T-Mobile, "[t]he exact personal information accessed varies by individual. We have determined that the types of impacted information include: names, drivers' licenses, government identification numbers, Social Security numbers, dates of birth, T-Mobile prepaid PINs (which have already been reset to protect you), addresses and phone number(s)."

44. T-Mobile offered—free of charge—a host of identity-protection services to its customers to help mitigate the risks stemming from the Data Breach. The free services include two years of identity

## What you can do:

As we move quickly to protect you, we also want to equip you to protect yourself. It's recommended that you take proactive steps regularly to protect your data and identity, and now's a great time to do that. To be clear, **we have no information that indicates any passwords, postpaid PIN numbers, or financial or payment information have been compromised.** Still, the following steps are always smart practices to help keep your account more secure. We encourage you to complete these actions as soon as possible:

| Protect your identity with McAfee | Activate Scam Shield™ | Further protect your T-Mobile account | Additional resources |
|---|---|---|---|
| Sign up for McAfee® ID Theft Protection Service FREE for two years provided by T-Mobile. | Tap into our network's advanced scam-blocking protection and use anti-scam features such as Scam ID, Scam Block, and Caller ID—FREE to all T-Mobile customers. | Use our free Account Takeover Protection service to help protect against an unauthorized user fraudulently porting out and stealing your phone number (postpaid only). | Check out more ways to protect yourself. |
| Claim now > | Get more details > | See how > | See how > |

Class Action Complaint

theft protection through McAfee, scam call protection (already available to T-Mobile customers), and an account takeover prevention service (available only to post-paid T-Mobile customers).

45.     The same day, August 19, the Federal Communications Commission announced a probe into the hack. Referring to the FCC's cybersecurity guidelines, an FCC spokesman stated that "Telecommunications companies have a duty to protect their customers' information."

46.     On August, 20, T-Mobile provided the public and its customers with additional information about the Data Breach, including details on who was affected by the Data Breach and what PII was exposed. T-Mobile's forensic analysis determined that at least the following categories of information had been taken from its servers:

- 7.8 million current T-Mobile postpaid customer accounts that included first and last names, date of birth, SSN, and driver's license/ID information, phone numbers, and IMEI and IMSI information.

- 5.3 million current postpaid customer accounts that had one or more associated customer names, addresses, date of births, phone numbers, and IMEIs and IMSIs.

- Data files with information from about 40 million former or prospective T-Mobile customers, including first and last names, date of birth, SSN, and driver's license/ID information.

- 667,000 accounts of former T- Mobile customers that were accessed with customer names, phone numbers, addresses and dates of birth.

- An unspecified number of data files including phone numbers, IMEI, and IMSI numbers.

- Approximately 850,000 active T-Mobile prepaid customer names, phone numbers and account PINs. Similar information from additional inactive prepaid accounts was also accessed. Up to 52,000 names related to current Metro by T-Mobile accounts may have been included.

47.     On August 26, The Wall Street Journal reported that the hacker responsible for the Data Breach is John Binns, a 21-year-old American who moved to Turkey a few years ago. In an interview conducted over the Telegram messaging app, Binns told The Wall Street Journal that he managed to pierce T-Mobile's cybersecurity defenses after discovering in July an unprotected router exposed on the internet. Binns told The Wall Street Journal that he had been scanning T-Mobile's known internet addresses for weak spots using a simple tool available to the public.

Class Action Complaint

48.     Binns told The Wall Street Journal that he hacked T-Mobile's servers to gain attention: "Generating noise was one goal." He did not say whether he had sold any of the data he accessed or whether he was paid to breach T-Mobile's servers.

49.     According to The Wall Street Journal, "Several cybersecurity experts said the public details of the hack and reports of previous T-Mobile breaches show the carrier's defenses need improvement. Many of the records reported stolen were from prospective clients or former customers long gone. 'That to me does not sound like good data management practices,' said Glenn Gerstell, a former general counsel for the National Security Agency."

50.     Binns similarly told The Wall Street Journal: "I was panicking because I had access to something big . . . Their security is awful."

51.     It took Binns just a week to burrow into the servers that contained the PII of millions of T-Mobile's current, former, and prospective customers.

52.     The hack occurred around August 4—nine days before the security research firm Unit221B LLC reported to T-Mobile that its customers' data was being sold on the dark web. T-Mobile took another two days to publicly acknowledge that it was investigating a potential breach.

53.     Binns, who uses the online aliases IRDev and v0rtex among others, showed The Wall Street Journal that he could access accounts linked to the IRDev alias, and shared screenshots depicting access into T-Mobile's network.



```
================================================================
          T-Mobile USA Corporate Network

Use  of  this  system  is  explicitly  limited  to  the  employees of
T-Mobile  USA  individuals  conducting  business  at  the  behest of
T-Mobile.  All data contained on T-Mobile computer systems is owned
by  T-Mobile  and  may  be monitored,  intercepted, read, copied, or
captured in any manner and disclosed by authorized  personnel.

          THERE IS NO RIGHT TO PRIVACY ON THIS SYSTEM.
```

54.     Another screenshot taken by Binns reflects tables of personal information found on T-Mobile's servers:



55.     On August 27, T-Mobile CEO Mike Sievert posted an open letter on the T-Mobile website, which described the two-week period since the Data Breach as "humbling for all of us at T-Mobile as we have worked tirelessly to navigate a malicious cyberattack on our systems." According to Sievert, the Data Breach is now "contained and our investigation substantially complete."

56.     Sievert wrote that "[o]n August 17th, we confirmed that T-Mobile's systems were subject to a criminal cyberattack that compromised data of millions of our customers, former customers, and prospective customers. Fortunately, the breach did not expose any customer financial information, credit card information, debit or other payment information but, like so many breaches before, some SSN, name, address, date of birth and driver's license/ID information was compromised."

57.     Sievert stated that "[t]hrough our investigation into this incident, which has been supported by world-class security experts at Mandiant from the very beginning, we now know how this bad actor illegally gained entry to our servers and we have closed those access points. We are confident that there is no ongoing risk to customer data from this breach."

Class Action Complaint

58.     Sievert's letter continued: "[w]e recognize that many are asking exactly what happened. While we are actively coordinating with law enforcement on a criminal investigation, we are unable to disclose too many details. What we can share is that, in simplest terms, the bad actor leveraged their knowledge of technical systems, along with specialized tools and capabilities, to gain access to our testing environments and then used brute force attacks and other methods to make their way into other IT servers that included customer data. In short, this individual's intent was to break in and steal data, and they succeeded."

59.     Sievert wrote that "[s]ince confirming the breach, we have worked around the clock to understand impact and risk to customers and others and have done our very best to be transparent about those impacts as quickly as possible. This is not a one-and-done process. There is much work to do, and this will take time, and we remain committed to doing our best to ensure those who had information exposed feel informed, supported, and protected by T-Mobile."

60.     Sievert confirmed that, as of August 27, "we have notified just about every current T-Mobile customer or primary account holder who had data such as name and current address, Social Security number, or government ID number compromised. T-Mobile customers or primary account holders who we do not believe had that data impacted will now see a banner on their MyT-Mobile.com account login page letting them know. We are also now working diligently to notify former and prospective customers. Our goal is to ensure that we are providing clear information about how customers and those affected can protect themselves."

61.     Sievert concluded that:

> We know that the bad actors out there will continue to evolve their methods every single day and attacks across nearly every industry are on the rise. However, while cyberattacks are commonplace, that does not mean that we will accept them. T-Mobile is taking significant steps to enhance our approach to cybersecurity.

> Today I'm announcing that we have entered into long-term partnerships with the industry-leading cybersecurity experts at Mandiant, and with consulting firm KPMG LLG. We know we need additional expertise to take our cybersecurity efforts to the next level—and we've brought in the help. These arrangements are part of a substantial multi-year investment to

adopt best-in-class practices and transform our approach. This is all about assembling the firepower we need to improve our ability to fight back against criminals and building a future-forward strategy to protect T-Mobile and our customers.

As I previously mentioned, Mandiant has been part of our forensic investigation since the start of the incident, and we are now expanding our relationship to draw on the expertise they've gained from the front lines of large-scale data breaches and use their scalable security solutions to become more resilient to future cyber threats. They will support us as we develop an immediate and longer-term strategic plan to mitigate and stabilize cybersecurity risks across our enterprise.

Simultaneously, we are partnering with consulting firm KPMG, a recognized global leader in cybersecurity consulting. KPMG's cybersecurity team will bring its deep expertise and interdisciplinary approach to perform a thorough review of all T-Mobile security policies and performance measurement. They will focus on controls to identify gaps and areas of improvement. Mandiant and KPMG will work side-by-side with our teams to map out definitive actions that will be designed to protect our customers and others from malicious activity now and into the future. I am confident in these partnerships and optimistic about the opportunity they present to help us come out of this terrible event in a much stronger place with improved security measures.

As we learn and evolve, we will always work to keep you informed of any important updates or relevant changes. I also commit to you that while we're starting on this path with humility, we will bring to it the same Un-carrier energy that we have used for years to help transform the wireless industry for the benefit of consumers and businesses everywhere.

62.     As T-Mobile recognized in its 2020 annual report, its customers' PII is very valuable to cybercriminals. Threats to T-Mobile's customers range from basic text message phishing scams to much more elaborate identity theft schemes. For example, a database tying together a name, phone number, and physical address can make it much easier to convince a user to click on a link to a website with malware. Similarly, centralizing names, phone numbers, addresses, and Social Security numbers makes the task of identity theft much easier for criminals.

63.     And even though an individual's names and addresses are often public, IMEI numbers are not. Because IMEI numbers are tied to a specific customer's phone, sophisticated hackers can use that information to engage in a SIM-swap attacks where the hacker takes control of the user's phone. This can

lead to account takeovers and access to banking and medical records that require two-factor authentication through the victim's phone number.

## III. T-MOBILE AGGREGATES, CENTRALIZES, AND STORES SENSITIVE CUSTOMER DATA IN AN UNREASONABLY DANGEROUS WAY TO BOOST PROFITS – AND CONTINUES TO DO SO TO THIS DAY

64. T-Mobile's Privacy Policy regarding protection of its customers' PII reads, in its entirety, as follows: "We use administrative, technical, contractual, and physical safeguards designed to protect your data while it is under our control. For example, when you contact us by phone or visit us in our stores, we have procedures in place to make sure that only the primary account holder or authorized users have access. Despite our efforts, we cannot guarantee that our safeguards will prevent every unauthorized attempt to access, use, or disclose personal data. Be sure to use a strong password to access your information and not one you use for other services. You should also use multi-factor authentication where possible."

65. Dough Schmidt, a Professor of Computer Science at Vanderbilt University, noted that in light of the "6 other data breaches in the past 4 years," T-Mobile's "IT system is particularly vulnerable since they haven't been able to rectify their known security issues during this time period, which should be concerning to customers."

66. One reason for this is because T-Mobile has failed to meet the minimum standards of the United States Department of Commerce's National Institute of Standards and Technology's ("NIST") Cybersecurity Framework Version 1.1 including, but not limited to, PR.AC-1, PR.AC-2, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.AE-1, DE.AE-2, DE.AE-3, DE.E-4, DE.AE-5, DE.CM-1, DE.CM-2, DE.CM-3, DE.CM-4, DE.CM-5, DE.CM-6, DE.CM-7, DE.CM-8, DE.DP-1, DE.DP-2, DE.DP-3, DE.DP-4, and DE.DP-5.

67. T-Mobile similarly has failed to meet the minimum standards of the FCC's Cybersecurity Planning Guide, including the standards pertaining to Privacy and Data Security, Network Security, Website Security, and Operational Security.

68. These minimum standards, which are best-practices in the cybersecurity industry and are employed by virtually every other large company that stores PII, include: management of authorized user

credentials, limitations on remote access, network integrity and segmentation, tying user identity to credentials used for system interactions, user and device authentication, file encryption, utilization of software to detect malware, surveillance of network activity for potential unauthorized access, implementation of firewalls to protect networks and servers from unauthorized access, and staff training.

69. It is commercially reasonable for T-Mobile to employ these minimum standards.

70. However, because T-Mobile wants to employ powerful machine learning, artificial intelligence, and other data analysis tools upon years and years of data from millions of its customers (and former customers) to boost company targeting and profits, it centralizes this data and makes it unreasonably accessible to programmatic access—facilitating attack after attack after attack on customer data, including the most recent one.

71. This situation will not improve absent intervention by this Court. T-Mobile has promised again and again to do better—and indeed, did so again on August 27, 2021, the day this Complaint was filed. T-Mobile has **not** done better without judicial intervention—and the situation imperils Plaintiffs' and other class members' sensitive data to this day.

72. Plaintiffs seek injunctive relief on behalf of themselves and those similarly situated to mitigate, and indeed remedy, the ongoing dangerous centralization and inadequate protection of sensitive data on T-Mobile's servers and throughout T-Mobile's data collection, machine learning, and information storage apparatus.

## CLASS ACTION ALLEGATIONS

73. The class's claims all derive directly from a course of conduct by T-Mobile. T-Mobile has engaged in uniform and standardized conduct toward the class. It did not materially differentiate in their actions or inactions toward members of the class. The objective facts on these subjects are all the same for all class members. Within each Claim for Relief asserted by the class, the same legal standards govern. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Fed. R. Civ. P. 23.

74. This action may be brought and properly maintained as a class action because resolution of the questions it presents is one of a common or general interest, and of many persons, and also because

the parties are numerous, and it is impracticable to bring them all before the court. Plaintiffs may sue for the benefit of all as a representative party pursuant to Federal Rule of Civil Procedure 23.

### The Class

75.     Plaintiffs bring this action and seek to certify and maintain it as a class action under Federal Rule of Civil Procedure 23 on behalf of themselves and a class defined as follows:

> All T-Mobile customers, including persons, business associations, entities,
> or corporations, whose PII was accessed, compromised, or stolen from T-
> Mobile in the Data Breach.

76.     Excluded from the nationwide class is T-Mobile, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### Numerosity and Ascertainability

77.     The members of the class are so numerous that a joinder of all members would be impracticable. Indeed, there are approximately 100 million T-Mobile customers whose data was compromised as a result of T-Mobile's failure to protect its users' data.

78.     The class is ascertainable. The class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to self-identify as having a right to recover based on the description. Other than by direct notice, alternatively proper and sufficient notice of this action may be provided to the class members through notice disseminated by electronic means, through broadcast media, and published in newspapers or other publications. Moreover, T-Mobile is in possession of all user contact information, including e-mail addresses.

### Typicality

79.     Plaintiffs' claims are typical of the members of the class. The evidence and the legal theories regarding T-Mobile's alleged wrongful conduct are substantially the same for Plaintiffs and all of the class members.

**Adequate Representation**

80.     Plaintiffs will fairly and adequately protect the interests of the class members. Plaintiffs have retained competent counsel experienced in data security, machine-learning and artificial intelligence, and class action litigation to ensure such protection. Plaintiffs and their counsel intend to prosecute this action vigorously.

**Grounds Generally Applicable to the Class**

81.     T-Mobile has acted or refused to act on grounds generally applicable to Plaintiffs and the Class members, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Specifically, the harm caused by T-Mobile's knowing and willful failure to safeguard and secure its users' sensitive PII, as well as its dangerous centralization and unnecessary aggregation of customer information, applies generally to the class and would be remedied by final injunctive or declaratory relief.

**REALLEGATION AND INCORPORATION BY REFERENCE**

82.     Plaintiffs reallege and incorporate by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of the class.

**CLAIMS FOR RELIEF**
**COUNT ONE:**
**(on behalf of Plaintiffs and the Class)**
**Violation of the California Unfair Competition Law**
**Business and Professions Code § 17200, *et seq.***

83.     Plaintiffs bring this Count on behalf of the class.

84.     California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

85.    The UCL prohibits any unlawful, unfair or fraudulent business cat or practice. A business practice need meet only one of the three criteria to be considered unfair competition. An unlawful business practice is anything that can properly be called a business practice and at the same time is forbidden by law.

86.    As explained above, T-Mobile's knowing and willful failure to safeguard and secure its users' sensitive PII violates the UCL, as does its dangerous centralization and unnecessary aggregation of customer information.

87.    Commonly accepted and widely practiced industry standards provide that commercially reasonable methods should be utilized to prevent access to sensitive PII stored in commercial databases. These commercially reasonable methods are widely known and used throughout the cybersecurity industry.

88.    T-Mobile willfully and knowingly failed to expend the resources necessary to protect the sensitive data that Plaintiffs and the class provided T-Mobile, in contravention of industry standards for database security and its own user agreements. By creating the perception that T-Mobile would implement security safeguards designed to protect user data, when T-Mobile in fact was declining to do so, T-Mobile gained an unfair advantage over its competitors.

89.    By failing to maintain its users' PII in a secure manner, T-Mobile failed to use commercially reasonable safeguards to protect its customers' personal data. Storing sensitive customer PII in a manner where T-Mobile has been a successful target of at least six data breaches in the last four years is not commercially reasonable and does not comport with industry standard protocols.

90.    In fact, T-Mobile aggregates and stores its users' data in an unreasonably centralized and accessible manner to facilitate powerful machine learning, artificial intelligence, and data mining tools and operations to improve T-Mobile targeting and profits. This data mining apparatus has pushed T-Mobile to decline to fix what is obviously broken: its customers' sensitive data is unreasonably vulnerable to hacks.

91.    Plaintiffs and the class members relied on T-Mobile's misrepresentations that T-Mobile would keep their PII safe.

92.     By failing to implement security safeguards to protect its users' PII—and indeed, by affirmatively designing and operating a data centralization and mining apparatus that repeatedly and continuously imperils large swathes of customer data—T-Mobile violated its own written policies and acted deceptively.

93.     T-Mobile violated the "unlawful" prong of the UCL because its conduct violated the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*.

94.     T-Mobile violated the fraudulent prong of the UCL by misrepresenting to its users that it would implement security safeguards to secure their PII in order to induce reliance on its statements for commercial gain.

95.     T-Mobile's misrepresentations regarding its security procedures were likely to deceive the public because they were authoritative descriptions made in the contracts between T-Mobile and its users. Because PII and security is likely to, and does, affect consumers' willingness to use and pay for a service, T-Mobile misrepresentations were material.

96.     T-Mobile has violated the unfair prong of the UCL because it operated a business that induced Plaintiffs and the Class members to submit PII with the written assurance that their data would be protected security safeguards designed to protect user data. However, T-Mobile knowingly failed to employ such safeguards for data protection—and indeed, by affirmatively designed and operating (and continues to operate) a data centralization and mining apparatus that repeatedly and continuously imperils large swathes of customer data—causing the widespread exposure of its users' PII. Thus, T-Mobile's failure to implement security safeguards caused harm to consumers that substantially outweigh any benefit T-Mobile received from its practices.

97.     As a result of T-Mobile's conduct as alleged herein, Plaintiffs and the class members have lost money and/or property. All class members have lost money in the form of money that they have paid—and continue to pay—for T-Mobile services, as well as the value of their PII. They have lost property in the form of their stolen PII, which is now in the hands of hackers who are attempting to sell it and/or use it to their advantage.

98.     Pursuant to Cal. Bus. & Prof. Code §§ 17203 and/or 17204, Plaintiffs and the Class members seek an order permanently enjoining T-Mobile from continuing to engage in the unfair and unlawful conduct described herein. Plaintiffs and the Class members seek an order requiring T-Mobile to (1) immediately stop the unlawful practices stated in this Complaint; (2) ensure that T-Mobile user data does not appear in internet search engines or on the dark web; (3) ensure that T-Mobile employs commercially reasonable methods to safeguard its user data; and (4) pay attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

**COUNT TWO:**

**(on behalf of Plaintiff and the Class)**

**Violation of the Consumer Legal Remedies Act**

**Violation of Civil Code § 1750, *et seq.***

99.     Plaintiffs bring this Count on behalf of the class.

100.     The Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA") prohibits the act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission of any material fact with intent that others rely upon such act in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby.

101.     As described in this Complaint, T-Mobile has engaged in deceptive practices, unlawful methods of competition, and/or unfair acts as defined by the CLRA, to the detriment of Plaintiffs and the Class members.

102.     T-Mobile, acting with knowledge, intentionally and unlawfully brought harm upon Plaintiff and the Class members by deceptively inducing Plaintiffs and the Class members to provide PII to T-Mobile based on deceptive and misleading representations that it would take commercially reasonable steps to safeguard its customers' sensitive PII in line with industry standards and technology. Specifically, T-Mobile violated the CLRA by violating § 1770(a)(5) by representing that goods or services have characteristics and benefits, which they do not have—including security safeguards to protect its customers' PII, which it actually did not do. T-Mobile not only failed (and fails) to implement

security safeguards to protect its users' PII, it affirmatively designing and operated (and continues to operate) a data centralization and mining apparatus that repeatedly and continuously imperils large swathes of customer data.

103. Plaintiffs and the Class members purchased T-Mobile products and services by paying fees for telecommunications services.

104. Plaintiffs and the Class members relied on T-Mobile's promise to use security safeguards designed to protect their PII and accepting the T-Mobile terms of use. Because T-Mobile intended Plaintiffs and the Class to rely as such, T-Mobile's misstatements occurred as part of a transaction intended to result in a sale or lease of goods to consumers.

105. Plaintiffs and the Class members have suffered harm as a direct and proximate result of T-Mobile's violations of law and wrongful conduct.

106. Under Federal Rule of Civil Procedure 23(b) and Cal. Civ. Code §§ 1780(a) and (b), Plaintiff and the class seek injunctive relief requiring T-Mobile to cease and desist the illegal conduct described herein and any other appropriate remedy for violations of the CLRA.

107. Plaintiff does not claim any monetary damages under the CLRA at this time.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgment be entered against Defendants and that the Court grant the following:

A. Enter an order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B. Enter a judgment against Defendant in favor of Plaintiffs and the Class;

C. Grant permanent injunctive relief pursuant to remedy the ongoing effects of Defendant's unlawful conduct.

D. Award Plaintiffs and the class their costs of suit, including reasonable attorneys' fees as provided by law; and

E. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated: August 27, 2021

Respectfully submitted,

_____

_____

**Brian J. Dunne** (CA 275689)
bdunne@bathaeedunne.com
**BATHAEE DUNNE LLP**
633 West Fifth Street
Suite 2600
Los Angeles, CA 90071
(213) 462-2772

**Yavar Bathaee** (CA 282388)
yavar@bathaeedunne.com
Edward M. Grauman (*p.h.v.* forthcoming)
egrauman@bathaeedunne.com
Andrew C. Wolinsky (*p.h.v.* forthcoming)
awolinsky@bathaeedunne.com
**BATHAEE DUNNE LLP**
445 Park Ave., 9th Floor
New York, NY 10022
(332) 322-8835

*Attorneys for Plaintiffs*